In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3764

AMERISURE MUTUAL INSURANCE COMPANY,

*Plaintiff-Appellee,*

*v.*

MICROPLASTICS, INC.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:07-cv-03827—**John A. Nordberg**, *Judge.*

ARGUED APRIL 21, 2010—DECIDED SEPTEMBER 20, 2010

Before CUDAHY, RIPPLE, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* This case presents a recurring problem under Illinois insurance law governing an insurer's duty to defend under a commercial general liability policy. Suppose a buyer sues a manufacturer for supplying defective products, but the buyer does not specify the elements of its claims for damages in the complaint. A commercial general liability policy is in-

tended to cover, among other risks, the insured's liability for accidental bodily injury and property damage caused by its defective products. The policy is not intended, however, to cover the costs of replacing or repairing the defective products themselves. The parties agree here that if the unhappy buyer alleges that the defective products have caused bodily injury or damage to property other than the defective products themselves, a commercial general liability policy will require the insurer to defend its insured. They also agree that if the unhappy buyer alleges only a claim for repair or replacement of the defective products, the policy will not require the insurer to defend what amounts to only a breach of contract claim against its insured.

The problem presented here is whether the insurer has a duty to defend the insured when the unhappy buyer makes only general allegations for costs incurred as a result of the defective products, without explicitly disavowing any claim for damage to property other than the defective products themselves. The unhappy buyer's claim in this case has all the earmarks of a pure breach of contract claim for costs of repair, replacement, or similar economic losses not covered by the insurance policy. There is no indication that the insured manufacturer's products caused damage to any property other than the defective products themselves. Although the insured manufacturer offers speculative hypotheses about scenarios that are not literally inconsistent with the unhappy buyer's allegations, those speculative hypotheses are not sufficient to trigger the insurer's duty to defend under the commercial general liability policies. We affirm the district court's decision to that effect.

I. *The Dispute Between Microplastics and Valeo*

The district court granted summary judgment for the insurer, plaintiff-appellee Amerisure Mutual Insurance Company. The relevant facts are undisputed, consisting primarily of the terms of the relevant insurance policies and the contents of various pleadings in the underlying lawsuit between the unhappy buyer and defendant-appellant Microplastics, Inc. Microplastics manufactures insert molding components, which are plastic pieces used to manufacture various mechanical devices. The unhappy buyer in this case was Valeo Security Systems. In 2004, Valeo began buying Microplastics components and used them to manufacture automobile door latch assemblies that it sold to automobile manufacturers (referred to in industry jargon as "original equipment manufacturers" or "OEMs"). The supply relationship between Microplastics and Valeo was governed by purchase orders that included quality specifications and prices.[1]

The relationship soured quickly. By October 2004, one unidentified OEM began complaining to Valeo about problems with the door latch assemblies. It became clear to all involved that Microplastics was selling Valeo de-

---

[1] Microplastics and Valeo also entered into a tooling agreement under which Microplastics manufactured certain unique tools to use in the manufacture of the component parts. Valeo alleged breaches of both the purchase orders and the tooling agreement. This appeal concerns only the breaches of the purchase orders.

fective parts. Microplastics has forwarded some creative hypotheses for how these defects manifested themselves, but the only details with any factual support in the record are found in a February 2005 email from Valeo to Microplastics president Mike Roberts identifying the following defects:

> The issue is that when we launched with production parts from Microplastics we had no idea your process was allowing some parts which:
>
> 1) The potting material did not fill the voids under the terminals.
>
> 2) The potting was not adequately cured to prevent water intrusion.
>
> 3) The potting material did not bond to the upper housing.
>
> In addition the bus bar was not over-molded as it should have been, limiting protection, and elevating the effect of every issue above. Each of these is the direct result of your process which you must test and qualify to assure compliance, not Valeo.

R. 37, Ex. A ¶¶ 31, 32. An internal email from Roberts to Microplastics managers a few months earlier seemed to acknowledge both the problem and Microplastics' responsibility for it:

> [W]e have to get rid of Valeo . . . . I am convinced that this piece of crap is a major recall in the making. It will take a while to make it go away but it NEEDS to go away . . . . I apologize for being greedy and

wishful thinking that Valeo would turn out [okay]. Nothing comes from being greedy and stupid. I was both. Saw the train wreck coming two years ago but kept it going because we needed the work. Next time I do that somebody, or all of you, slap me.

R. 37, Ex. G ¶¶ 11-13.

These problems remained unresolved by August 2006, when Valeo sent a demand letter to Microplastics formally asserting that Microplastics had breached the quality and engineering specifications of the purchase orders. The letter stated that Valeo had chosen to "terminate and cancel the Purchase Orders for cause" and said that Valeo would apply a debit of about $1,300,000 to offset "the damages incurred by Valeo due to Microplastics' breaches."

## II. *Litigation and Valeo's Counterclaim*

Settlement negotiations fell through, and in October 2006 Microplastics filed suit for breach of contract against Valeo. Microplastics alleged that Valeo had failed to pay 20 invoices for parts delivered, totaling more than $500,000. In November 2006, Valeo filed a six-count counterclaim. See *Microplastics, Inc. v. Valeo Security Systems, N.A.*, No. 06-cv-6187 (N.D. Ill.). Count I, the only count pertinent here, reiterated the allegations of the demand letter, seeking setoff and damages for economic losses incurred as a result of Microplastics' breaches of the purchase orders by failing to comply with engineering and quality specifications.

III. *The Insurance Dispute*

Appellee Amerisure insured Microplastics from July 2003 to July 2007 under a series of commercial general liability policies ("the CGL policies"). The CGL policies required Amerisure to pay Microplastics if it should ever be legally obligated to pay damages to any third party as a result of "property damage" or "personal injury" caused by an "occurrence." The CGL policies also required Amerisure to defend Microplastics against any lawsuit seeking such covered damages. The CGL policies defined "property damage" as:

   a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

   b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Amerisure was first notified of the Valeo counterclaim on March 1, 2007 by Microplastics' insurance broker. On April 13, 2007, Amerisure sent a letter to Microplastics with the heading "Reservation of Rights." Amerisure acknowledged receipt of the Valeo counterclaim and advised that it was "unable to provide [Microplastics] with a defense until we have completed our investigation." The letter cited the relevant coverage provisions and stated that "there appears to be a question as to whether or not this incident is a covered claim under the general liability policies issued to Microplastics, Inc. It does not appear that there has been any 'property

damage' caused by an 'occurrence.'" In a June 21, 2007 letter, Amerisure informed Microplastics that it was declining coverage and would not defend Microplastics against the Valeo counterclaim. Amerisure then filed this action on July 9, 2007, seeking a declaration that it had no duty to defend or indemnify Microplastics with respect to the Valeo counterclaim.

Without the aid of Amerisure's defense, Microplastics sought to settle the pending claims. On September 12, 2007, Microplastics and Valeo entered into a settlement agreement to resolve all claims between them. No cash changed hands under the agreement, but Microplastics issued a credit memo for the amount that Microplastics had billed Valeo for its supply of the allegedly defective supply parts, more than $500,000. The record does not reveal that Microplastics or Amerisure gained any new knowledge of the nature of the "customer costs" referenced in Valeo's counterclaim.

Meanwhile, the present action between Amerisure and Microplastics proceeded. The parties filed cross-motions for partial summary judgment on whether Amerisure had a duty to defend. The district court granted summary judgment for Amerisure, finding that the Valeo counterclaim did not trigger a duty to defend because it did not allege "property damage" or "bodily injury" under the CGL policies. Microplastics appealed.[2]

---

[2] Microplastics still contends that the counterclaim potentially implicates both "property damage" and "bodily injury," but it attempts to explain only the "property damage" theory.

IV. *The Duty to Defend*

Microplastics contends that the Valeo counterclaim's allegations potentially fell within the CGL policies' "property damage" provision, and therefore triggered Amerisure's duty to defend under Illinois law. Microplastics' argument relies entirely on hypothetical situations rather than on any facts actually alleged in the Valeo counterclaim. Under Illinois law, an insurer has no duty to defend unless the underlying claim contains explicit factual allegations that potentially fall within policy coverage. Because the Valeo counterclaim contained no such factual allegations, and because the allegations were fully consistent with a simple claim for breach of warranty, Amerisure had no duty to defend.

Under Illinois law, a liability insurer's duty to defend is broader than its duty to indemnify, but it is not unlimited. See *National Casualty Co. v. McFatridge*, 604 F.3d 335, 338 (7th Cir. 2010); *American Family Mutual Ins. Co. v. W.H. McNaughton Builders, Inc.*, 843 N.E.2d 492, 497 (Ill. App. 2006). To determine whether an insurer has a duty to defend its insured, we compare the factual allegations of the underlying complaint (or in this case, counterclaim) to the language of the insurance policy. *Lyerla v. AMCO Ins. Co.*, 536 F.3d 684, 688 (7th Cir. 2008); *General Agents Ins. Co. of America, Inc. v. Midwest Sporting Goods Co.*, 828 N.E.2d 1092, 1098 (Ill. 2005). "If the facts alleged in the underlying complaint fall within, or potentially within, the policy's coverage, the insurer's duty to defend arises.*" Santa's Best Craft, LLC v. St. Paul Fire and Marine Ins. Co.*, 611 F.3d 339, 346 (7th Cir. 2010) (quotations

omitted); *Crum and Forster Managers Corp. v. Resolution Trust Corp.*, 620 N.E.2d 1073, 1079 (Ill. 1993). "Both the policy terms and the allegations in the underlying complaint are liberally construed in favor of the insured, and any doubts and ambiguities are resolved against the insurer." *State Farm Fire and Casualty Co. v. Perez*, 899 N.E.2d 1231, 1235 (Ill. App. 2008), citing *Pekin Ins. Co. v. Beu*, 876 N.E.2d 167, 170 (Ill. App. 2007). However, the general rules that favor the insured must "yield to the paramount rule of reasonable construction which guides all contract interpretations*." Western States Ins. Co. v. Bobo*, 644 N.E.2d 486, 488 (Ill. App. 1994), quoting *Travelers Ins. Cos. v. P.C. Quote, Inc.*, 570 N.E.2d 614, 617 (Ill. App. 1991) (quotation marks omitted).

An allegation of defective or faulty workmanship in the insured's own products does not, by itself, allege "property damage" under a standard CGL policy like these Amerisure policies. Such policies "are intended to protect the insured from liability for injury or damage to the persons or property of others; they are not intended to pay the costs associated with repairing or replacing the insured's defective work and products, which are purely economic losses*." West Bend Mutual Ins. Co. v. People of Illinois*, 929 N.E.2d 606, 614-15 (Ill. App. 2010), quoting *Travelers Ins. Co. v. Eljer Manufacturing, Inc.*, 757 N.E.2d 481, 503 (Ill. 2001) (quotation marks omitted).

The parties do not dispute the legal background we have provided thus far. The dispute here lies in the application of these rules to the vague allegations in Valeo's

counterclaim against Microplastics. Valeo's counterclaim had all the earmarks of a buyer's breach of contract claim for products that failed to meet the agreed specifications, resulting in costs for repair or replacement, and perhaps additional consequential damages in the form of customer charge-backs for related costs. See generally Article 2, chapter 7 of the Uniform Commercial Code (as adopted by Illinois, 810 ILCS 5/2-701 *et seq*.). Valeo's counterclaim included no indication that it was asserting a claim for damage to property other than the defective products themselves.

Microplastics bases its asserted right to a defense from Amerisure on the allegations of paragraphs 14 and 15 of the Valeo counterclaim. Those paragraphs alleged:

14.   Valeo's customer with respect to the Component Parts charged Valeo for its costs associated with the defects.

15.   Microplastics is liable to Valeo for the costs charged to Valeo associated with the defects.

The counterclaim concluded by requesting relief in the form of an order declaring "that Valeo is entitled to setoff or recoupment of all damages it has incurred on account of Microplastics' breaches of the Purchase Orders . . . against any amount that may be due to Microplastics by Valeo," and an award of damages that might be "otherwise due Microplastics from Valeo under the Purchase Orders (prior to application of Valeo's setoff)," attorney fees, and litigation costs. So Valeo's customer charged it for unspecified costs associated with the defective parts originally supplied by Microplastics.

Microplastics points out correctly that these general allegations do not logically foreclose the theoretical possibility that Valeo's customer charged back costs resulting from potentially covered damage to property beyond the defective products. Is that theoretical possibility enough to trigger the duty to defend under a CGL policy?

Microplastics argues that the answer is yes, relying on the generous Illinois rule that, "If the facts alleged in the underlying complaint fall within, or potentially within, the policy's coverage, the insurer's duty to defend arises." *Santa's Best Craft*, 611 F.3d at 346; *Crum and Forster*, 620 N.E.2d at 1079. If these allegations by Valeo of unspecified costs charged back by its customer are enough to trigger the duty to defend, then we would expect that CGL insurers would quickly find themselves responsible for defending routine breach of warranty disputes between commercial manufacturers and their buyers.

Microplastics attempts to fill in details in the vague allegations by hypothesizing situations which, if alleged or true, would bring the costs charged back to Valeo within the scope of "property damage" covered by the CGL policies. For example, Microplastics speculates, the costs might refer to damage to the personal property of consumers who bought cars. Microplastics hypothesizes that its defective parts might have caused trunk lids to open spontaneously, causing the buyers' property in trunks to spill onto the roadways. Or perhaps the defective parts allowed water to leak into the passenger

or trunk areas, causing damage to property stored in the vehicles. Microplastics contends that because the language of the counterclaim does not specifically foreclose these hypothetical situations, the allegations "potentially" implicate "property damage" under the CGL policies and therefore trigger Amerisure's duty to defend under Illinois law. See *Santa's Best Craft*, 611 F.3d at 346.

This interpretation goes too far. While an insurer's duty to defend in Illinois is broad, it is not without limits. The duty to defend applies only to facts that are explicitly alleged; "it is the actual complaint, not some hypothetical version, that must be considered." *Del Monte Fresh Produce N.A., Inc. v. Transportation Ins. Co.*, 500 F.3d 640, 643 (7th Cir. 2007) (finding no duty to defend), quoting *Connecticut Indemnity Co. v. DER Travel Service, Inc.*, 328 F.3d 347, 350-51 (7th Cir. 2003) (finding no duty to defend because the policy excluded willful misconduct and the underlying complaint alleged only willful misconduct; the fact that federal law also permitted the underlying plaintiff to recover for insured's simple negligence was irrelevant because the underlying complaint alleged no facts to support a negligence claim) (quotation marks omitted); see also *Allianz Ins. Co. v. Guidant Corp.*, 900 N.E.2d 1218, 1237-38 (Ill. App. 2008) (rejecting insured's view that the underlying claim alleged bodily injury because that interpretation relied on an application of the policy provision to hypothetical situations, rather than to the facts actually alleged; "hypothetical factual situations are simply irrelevant"). When an insurer determines whether it has a duty to defend, "Implied claims that are not specifically alleged can be ignored." *Del*

*Monte*, 500 F.3d at 644 (although insured's reading of the allegations "may be true in the abstract," the specific language of the allegations placed them within a policy exclusion).

Applying these principles here, we conclude that the Valeo counterclaim did not trigger Amerisure's duty to defend because it did not allege any facts that could potentially fall within the scope of covered "property damage." The Valeo counterclaim made no specific allegation of "property damage." The pertinent portion of the counterclaim simply alleged that the automobile manufacturer OEM who purchased the door latch assemblies charged Valeo for its "costs associated with the defects." It did not allege, or even suggest, that these costs have any relation to "property damage." Further, there is no support in the counterclaim or elsewhere in the record for Microplastics' theory that these costs are related to damage to consumers' personal property. There is no mention of consumers in the record, and while it is clear that the OEM installed defective door latch assemblies in some of its vehicles, there is no evidence or allegation that any of these vehicles were sold to consumers before the door latches were repaired. The record contains no allegation or evidence that the defects caused doors or trunks to open spontaneously, or even that the door latch assemblies were ever installed in the trunks of any vehicles.

We find instructive the Illinois decision in *Diamond State Ins. Co. v. Chester-Jensen Co., Inc.*, 611 N.E.2d 1083 (Ill. App. 1993), in which the appellate court affirmed

summary judgment finding no duty to defend. In *Diamond State*, the insured manufacturer sold part of an air conditioning system for a state office building. The system failed, resulting in sweltering conditions that caused most of the building to be uninhabitable. The state sued the manufacturer, seeking compensation for the significant expense it incurred as a result of the failure, including "modification and repairs to the heating, ventilation and air conditioning [HVAC] systems" and lost work days for state employees "who became ill and had to go either to a hospital or home because of the heat." 611 N.E.2d at 1085-86. The manufacturer sought coverage and defense from its insurer under a commercial general liability policy comparable to those at issue here. The manufacturer argued that the HVAC system repairs claim implicated the policy's "property damage" provision, and that the claim of lost productivity and work time due to employee illness implicated the policy's "bodily injury" provision. The court found that the complaint's allegations did not potentially fall within either provision and thus did not trigger the insurer's duty to defend. While the parties have devoted considerable attention to the "bodily injury" analysis in *Diamond State*, we believe that the court's "property damage" analysis provides decisive guidance on Illinois law here.

The underlying complaint in *Diamond State* did not specify the nature of the repairs to the HVAC system; that is, the allegation at issue did not explain whether these repairs were necessary simply because the manufacturer's defective parts needed to be replaced, or be-

cause the defective parts caused damage to other por-
tions of the HVAC system not made by the manufacturer.
The court found that this allegation did not implicate
"property damage" even under the broad Illinois duty-to-
defend standard, because there was no *express* factual
allegation that the insured's product caused damage to
the HVAC system:

> We find no express allegations of physical injury to
> property, rather only allegations that [insured]'s
> thermal units failed to perform their anticipated
> function. Nowhere in its complaint does the State
> allege that its HVAC system, or any portion or compo-
> nent thereof, was physically damaged, as opposed
> to having become simply inoperative because of the
> failure of the components to perform as warranted.
>
> *   *   *
>
> Although the allegations with respect to repair
> could be consistent with physical injury to other
> portions of the system aside from the [insured's]
> thermal banks themselves, they cannot by themselves
> denote that any such physical damage took place . . . .

*Diamond State*, 611 N.E.2d at 1088-89. The court further
noted that the allegation was "fully consistent with losses
suffered through contract failure" and thus further sup-
ported a finding that it did not implicate the "property
damage" provision. 611 N.E.2d at 1089.

Like the policy in *Diamond State*, the Amerisure CGL
policies defined "property damage" as "Physical injury
to tangible property" or "Loss of use of tangible property

that is not physically injured." And like the underlying complaint in *Diamond State*, the Valeo counterclaim did not expressly allege physical injury to or loss of use of tangible property. The counterclaim alleged only that Microplastics' products were defective, and it sought "costs associated with the defects." These allegations are comparable to the *Diamond State* allegations that sought compensation for HVAC repair costs. As the court explained in *Diamond State*: "Although the allegations with respect to repair could be consistent with physical injury to other portions [of the automobiles], they cannot by themselves denote that any such physical damage took place." 611 N.E.2d at 1089. While we are required to construe the underlying claim liberally and to resolve doubts in favor of coverage for the insured, *State Farm Fire and Casualty Co. v. Perez*, 899 N.E.2d at 1235, we are not permitted simply to speculate about possible factual allegations that are absent from the claim itself.

Like the allegations in *Diamond State*, the allegations at issue here are "fully consistent with losses suffered through contract failure." See *Diamond State*, 611 N.E.2d at 1089. Paragraphs 14 and 15 are the middle two of the six paragraphs comprising the counterclaim section entitled "Defective Component Parts" (paragraphs 12-17). Paragraph 12 summarized Microplastics' obligations under the purchase orders, and paragraph 13 alleged that the component parts failed to conform to those obligations. Paragraphs 16 and 17 simply explained that the terms of the purchase orders entitled Valeo to set off and recoup in the event of a Microplastics breach. Natu-

rally, if Valeo's claims are true, then its customers would have charged it for the cost of replacing or repairing the faulty products. Nothing in paragraphs 14 and 15 expanded the scope of the counterclaim beyond allegations for breach of contract. Like the HVAC repair allegation in *Diamond State*, these allegations are perfectly consistent with simple replacement costs and consequential damages based on breach of contract, and no language expressly stated, or even insinuated, that they might pertain to physical injury to property. Accordingly, because paragraphs 14 and 15 contained "no express allegations of physical injury to property" and were "fully consistent with losses suffered through contract failure", they did not even potentially implicate "property damage" under the CGL policies and thus did not satisfy the Illinois duty-to-defend standard. See *Diamond State*, 611 N.E.2d at 1088-89; see also *Allianz Ins. Co. v. Guidant Corp.*, 900 N.E.2d 1218, 1237-38 (Ill. App. 2008) (affirming trial court's finding that insurer had no duty to defend: "The Policyholders' failure to consider the entire context [of the clause] result[ed] in their flawed interpretation . . . . [T]he trial court's interpretation of the provision at issue is supported by the provision's plain and unambiguous language.").[3]

---

[3] We recognize that the outcome might be different if the insured came forward with evidence, beyond the claimant's pleadings, showing that the duty to defend indeed applied. We do not have that situation here. Amerisure's April 13, 2007 letter invited Microplastics to provide evidence showing that

(continued...)

Microplastics contends that *Diamond State* is distinguishable because the underlying complaint in that case alleged only economic damages. To support this contention, Microplastics points to the analysis of the bodily injury issue in that case. The *Diamond State* court found that the underlying complaint's allegation of work-days and productivity lost from illness and the effects of heat did not implicate the "bodily injury" policy provision because the allegation's language explicitly described economic losses related to work and wages. While the illness and hospitalization caused some of this lost work time, these "tangential factor[s]" did not bring the allegations within "bodily injury" coverage because the state was not seeking recovery for medical damages on behalf of its employees. 611 N.E.2d at 1087-88. Microplastics is correct that this portion of *Diamond State* is distinct from the present case. The supposed "bodily injury" allegation in that case specifically described the economic nature of the damages sought and foreclosed the possibility that the state was seeking recovery on behalf of third persons for physical injury and medical care. Unfortunately for Microplastics, that distinction has no bearing on the fact that the supposed "property damage" claims here and in *Diamond State* are so similar, and Microplastics has not attempted to draw such a distinction here.

---

[3] (...continued)
Valeo's allegations had some basis in third-party property damage, despite all appearances to the contrary. Microplastics did not accept the invitation.

Amerisure nevertheless contends that there is no express factual allegation rule, because such a rule would leave the insured "at the mercy of the drafting whims of plaintiffs' attorneys." See *Medmarc Casualty Ins. Co. v. Avent America, Inc.*, 612 F.3d 607, 615 (7th Cir. 2010) (applying Illinois law); *Abrams v. State Farm Fire & Casualty Co.*, 714 N.E.2d 92, 97 (Ill. App. 1999). That is a serious concern. Illinois courts have taken care to protect insureds from being denied the coverage and the defense costs they have paid for merely because a plaintiff in an underlying case has drafted a complaint without worrying about the defendant's insurance coverage. See *Pekin Ins. Co. v. Hallmark Homes, L.L.C.*, 912 N.E.2d 250, 257 (Ill. App. 2009) ("plaintiffs draft their complaints with their own ends in mind, not with the goal of spelling out whether an insurance company has a duty to defend any particular defendant"); *International Ins. Co. v. Rollprint Packaging Products, Inc.*, 728 N.E.2d 680, 688 (Ill. App. 2000) ("The question of coverage should not hinge on the draftsmanship skills or whims of the plaintiff in the underlying action.").

In applying this principle, however, Illinois cases distinguish between allegations of fact and allegations of legal theories. The insured's coverage and right to a defense depend not on the legal theories stated by the claimant in the underlying dispute, but on the factual allegations. "The factual allegations of the complaint, rather than the legal theory under which the action is brought, determine whether there is a duty to defend." *Pekin Ins. Co. v. Dial*, 823 N.E.2d 986, 990 (Ill. App. 2005). "[T]he suggestion . . . that the complaint must

explicitly identify the *claim* that is within the [policy] coverage represents an unduly narrow reading" of Illinois law, *Pekin Ins. Co. v. Hallmark Homes, L.L.C.*, 912 N.E.2d at 257 (emphasis added), and "the court 'should not simply look to the particular legal theories pursued by the claimant, but must focus on the allegedly tortious *conduct* on which the lawsuit is based,'" *Avent America*, 612 F.3d at 613 (emphasis added), quoting *Hurst-Rosche Engineers, Inc. v. Commercial Union Ins. Co.*, 51 F.3d 1336, 1342 (7th Cir. 1995); see also *Santa's Best Craft, LLC v. St. Paul Fire and Marine Ins. Co.*, 611 F.3d 339, 346 (7th Cir. 2010) ("Illinois law specifies that [w]e give little weight to the legal label that characterizes the underlying allegations. Instead, we determine whether the alleged conduct arguably falls within at least one of the categories of wrongdoing listed in the policy.") (interior quotation omitted); *Health Care Industry Liability Ins. Program v. Momence Meadows*, 566 F.3d 689, 696 & n.9 (7th Cir. 2009) ("While an insurer certainly has a duty to defend its insured against any complaint that leaves open the possibility of coverage, that duty is premised on the facts the parties to the underlying complaint actually alleged in their complaint"; insurer had no duty to defend under Illinois law because "the underlying complaint [was] absolutely devoid of any factual allegations suggesting such a claim") (internal citations omitted); *International Ins. Co. v. Rollprint Packaging Products, Inc.*, 728 N.E.2d at 688-89 (complaint that did not seek recovery under a wrongful eviction theory nevertheless triggered a duty to defend under the policy's "wrongful eviction" provision because the complaint provided a

detailed factual account that included the allegation that the insured defendant "told [plaintiff] he was fired and physically evicted [him] from his office and from the building" in an attempt to establish discriminatory discharge claims under federal statutes).

The factual allegations of Valeo's counterclaim did not trigger a duty to defend under the Amerisure CGL policies. We need not reach the other issues addressed by the parties. The judgment of the district court is AFFIRMED.